UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>TROY JOSEPH FLOWERS, SEAN PAUL NEVETT, and FRUITION, INC., formerly known as SEACOAST ADVISORS, INC.<br><br>Defendants. | Case No.: 17cv1456-JAH (JLB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR MONETARY REMEDIES** |

## **INTRODUCTION**

This civil-enforcement action involves allegations of stock market manipulation and matched trading in the securities of two companies by Defendants Troy J. Flowers ("Flowers"), Fruition Inc., a Nevada corporation ("Fruition"), and Sean P. Nevett ("Nevett"), (collectively referred to as ("Defendants")). Defendants implemented a scheme to profit by manipulating the price of publicly traded stocks. Judgment was entered against Flowers, Nevett, and Fruition following Notices of Settlement and Consent. The matter is now before the Court on a motion for monetary remedies pursuant to Consents and Judgments.

1

## BACKGROUND

On July 19, 2017, Plaintiff filed a Complaint against Defendants alleging fraud, manipulative trading practices, and various violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") including: (1) Section 10(b) of the Exchange Act and Rule 10b-5 (a) and (c); (2) Section 9(a)(1) of the Exchange Act; and (3) Section 17(a)(1) and (3) of the Securities Act. In general Defendants were alleged to have controlled 100% of the restricted and unrestricted stock of two non-operational companies, Lincot Corp. ("Lincot") and Artec Global Media, Inc. ("Artec") by managing brokerage accounts placed in the names of friends, family, and shell corporations (i.e. nominee accounts) to conceal their involvement. In pertinent part, the Complaint alleges the following:

> Beginning on or about September 5, 2012, and continuing through February 2013, Flowers and Nevett engaged in trading designed to manipulate and artificially increase the price of Licont's stock trading on the OTC Bulletin Board [5]… ¶In some instances, Nevett placed both the buy and sell order using different nominee accounts. In other instances, Nevett and Flowers placed matching orders in collusion with each other… ¶Through their matched trading, Flowers and Nevett manipulated the price of Licont shares from $3.45 per share on September 5, 2012, up to a high of $7.35 per share on February 6, 2013, which gave Licont a total market capitalization in excess of $19 million. Over the same period, Nevett and Flowers sold a majority of the unrestricted Licont shares they controlled to unrelated third parties, in open market transactions on the OTC Bulletin Board.

> Between September 2012 and February 2013, Fruition realized proceeds of approximately $1,338,315 from its sale of Licont shares to unrelated third parties. During the same period, Flowers and Nevett realized additional proceeds of approximately $832,342 from sales of Licont shares to unrelated third parties through other accounts.

---

[5] The over-the-counter bulletin board (OTCBB) is an electronic trading service provided by the National Association of Securities Dealers (NASD) that offers traders and investors up-to-the-minute quotes, last-sale prices and volume information for equity securities traded over the counter (OTC).

Between November 18, 2013 and September 30, 2014, Nevett and Flowers engaged in similar conduct in relation to Artec. The Complaint alleges:

> …Nevett and Flowers manipulated the price of Artec stock through matched orders to increase its price from $2.50 per share to $4.93 per share….¶Flowers sold approximately 444,000 Artec shares out of his Fruition account for proceeds of more than $1,100,000. Flowers transferred a portion of the proceeds to nominee bank accounts controlled by Nevett…

> Nevett continued to manipulate the price of Artec stock, which hit a high of $5 a share on August 22, 2014. ¶ [In] October 2014, Flowers transferred a total of $554,241 from Fruition trading accounts to Fruition's Wells Fargo checking account. Flowers kept approximately $176,000 of the funds in his checking account. Flowers wired approximately $377,300 to a Nevett-controlled bank account held in the name of a nominee third party company named Kavame Holdings. Nevett then transferred the entire amount to another nominee company, Bula Holdings, through which Nevett had been selling Artec stock. During the same month, Bula Holdings realized proceeds of about $280,000 from sales of Artec stock.

> After Flowers and Nevett ceased their manipulative activity, the price of Artec stock dropped substantially. By November 2014, Artec stock was trading at about $2.72 per share. Several months later, in June 2015, the price had dropped to $0.41 per share.

Defendants each filed an Answer to the Complaint and a Joint Discovery Plan was filed on November 3, 2017. On January 10, 2018, without admitting or denying the allegations, each Defendant filed a Notice of Settlement and Consent agreeing to the entry of Judgment, which ordered Defendants to pay: (1) disgorgement with prejudgment interest, calculated from July 19, 2017, and (2) a civil penalty in an amount to be determined under §20(d) of the Securities Act, 15 U.S.C. §77t(d) and §21(d)(3) of the Exchange Act, 15 U.S.C §78u(d)(3).

Defendants agreed they may not challenge the validity of the Consent or the Judgment, and that for the purposes of the motion, the allegations of the Complaint are accepted as true by the Court. Judgment against each Defendant was entered on January 19, 2018. On July 27, 2018, Plaintiff filed the instant motion for monetary remedies.

## DISCUSSION

### A. DISGORGEMENT

To establish an appropriate disgorgement amount, the SEC need only show a "reasonable approximation of profits" or investor losses causally connected to the violation. *S.E.C v. Platforms Wireless*, 617 F.3d 1072, 1096 (9th Cir. 2010); *J.T. Wallenbrock*, 440 F.3d 1109, 1113-14 (9th Cir. 2006). Once the SEC has made such a showing, the burden then shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *Platforms Wireless*, 617 F.3d at 1096 (quoting *SEC v. First City Financial Corp., Ltd*., 890 F.2d 1215, 1232 (D.C. Cir. 1989)). "[T]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id*. (quoting *First City Financial*, 890 F.2d at 1231, 1232).

Citing recent Supreme Court case, *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), Defendants Flowers and Fruition argue that disgorgement would be a penalty and inconsistent with its equitable purpose as remedial relief. In *SEC v. Jammin Java Corp*., No. 215CV08921SVWMRWX, 2017 WL 4286180, at *2 (C.D. Cal. Sept. 14, 2017), a similar position was taken by defendant in an effort to bar the SEC from seeking disgorgement. In *Jammin Java Corp*, the district court held that *Kokesh* leaves existing Ninth Circuit precedent in place reiterating the holding in *Krull v. SEC*, 248 F.3d 907, 914 & n.9 (9th Cir. 2001) that "just because something is a penalty for purposes of § 2462 does not mean it is a penalty for other purposes." *Jammin Java Corp*., 2017 WL 4286180, at *4. The Supreme Court explicitly noted that "[n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context…." *Kokesh*, 137 S. Ct. at 1642 n.3. This Court retains, as did our central counterpart, equitable power to order disgorgement.

Although Defendants characterize disgorgement as an improper penalty, Plaintiff highlights that each Defendant has already agreed to pay disgorgement with prejudgment interest pursuant to consents filed by each Defendant and the subsequent entry of judgment.

4

Plaintiff argues that any position taken by Defendants contrary to the terms of their consents should be rejected. Specifically the Court notes that Fruition has agreed to pay disgorgement and civil penalties separately and apart from individual Defendants, Flowers and Nevett. In addition, Flowers agreed to pay disgorgement after *Kokesh* was issued. Pursuant to consents filed by Defendants and judgment entered by this Court, the Court finds disgorgement of ill-gotten gains an appropriate remedy as to each Defendant.

### 1. Reasonable Approximation of Ill-Gotten Gains

The SEC seeks disgorgement of ill-gotten gains in the amount of $3,684,954.00, and prejudgment interest in the amount of $194,443.31, for a total of $3,879,397.31. Plaintiff's forensic expert opined that "a reasonable approximation of the personal benefits … obtained by Mr. Flowers was $1,673,745 and by Mr. Nevett was $2,010,869." See *Doc. No.* 34-2, p. 12 -14; *Expert Report*, p. 4. These figures are based on an analysis of the personal luxury expenses incurred and charged by Flowers and Nevett to an American Express credit card account held in the business name of Checkpoint Marketing. See *Doc. No.* 34-2, pg. 13; *Expert Report*, p. 5-6; Ex D.

Nevett challenges the approximation of total proceeds gained from the fraudulent scheme and contends that only those proceeds attributed to Fruition are appropriate to consider for disgorgement purposes. In light of Nevett's consent accepting the allegations in the Complaint as true, the Court finds Nevett's argument unpersuasive. Limiting disgorgement to $2,740,861 based only on proceeds distributed through Fruition is inconsistent with the allegations pled in the Complaint. The Complaint alleges Defendants used nominee accounts to perpetuate the fraud and held proceeds in accounts under various names. "The amount of disgorgement should include all gains flowing from the illegal activities." *Platforms Wireless*, 617 F.3d at 1096, quoting *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1114 (9th Cir. 2006).

Defendants Fruition and Flowers do not challenge the approximation of total proceeds, but instead challenge the approximation of Flower's personal benefit for purposes of apportionment. However, "[o]nce the Commission has established the close

5

collaboration between…. defendants in the fraudulent scheme, the burden [i]s on [defendants] to [first] establish that apportionment [i]s warranted." *S.E.C. v. Whittemore*, 659 F.3d 1, 11 (D.C. Cir. 2011) (citing *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3rd Cir. 1997)).

### 2. Joint and Several Liability versus Apportionment

The SEC seeks disgorgement of the ill-gotten gains jointly and severally against Flowers, Nevett, and Fruition. Plaintiff argues joint and several disgorgement is supported by the allegations in the Complaint showing that Defendants worked together as partners to perpetrate the fraud. The Ninth Circuit has found, "where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the federal securities laws, they [may be] held jointly and severally liable for the disgorgement of illegally obtained proceeds." *J.T. Wallenbrock*, 440 F.3d at 1117 (quoting *First Pac. Bancorp*, 142 F.3d at 1191). See also *SEC v. Gendreau & Associates, Inc.*, Case No. CV 09-3697-JST (FMOx), 2011 WL 13177284, at *4 (C.D. Cal. Apr. 29, 2011) (holding defendants jointly and severally liable).

Defendants argue joint and several liability is not appropriate and that the Court may "exercise…discretion in reducing or rejecting joint-tortfeasor liability when particular defendants…have received different amounts of 'illicit profits' from those violations." *SEC v. E-Smart Technologies*, 139 F. Supp. 3d 170, 189 (D.C. 2015). Despite the allegation of a close relationship between Defendants in carrying out illegal acts, Defendants contend that they may still prove apportionment in order to avoid joint and several liability. In sum, Defendants argue that they should only be held responsible for the amount equal to their pecuniary gain, which has already been determined by Plaintiff's expert. *Id.* at 188 (citing *SEC v. Whittemore*, 659 F. 3d 1, 9 (D.C. Cir. 2011). Plaintiff's expert summarized her opinion as follows:

> A reasonable approximation of the personal benefits from the Securities Transactions obtained by Mr. Flowers was $1,673,745 and by Mr. Nevett was $2,010,869. Such approximations are conservative because they do not include

6

personal benefits related to lifestyle expenses incurred on the Related Bank Accounts of at least $327,101 that cannot be apportioned between the two individual defendants based on information available to me.

*Doc. No. 34-2,* p. 11; *Expert Report,* p. 5. Defendants argue that the documented financial evidence supporting apportionment is abundant and is sufficient for the Court to reject joint and several liability. In addition, Flowers and Fruition contend apportionment would be more in line with the intended purpose of disgorgement, as remedial rather than punitive, and that it would be improper to hold a defendant jointly and severally liable for a sum above the amount of profit he obtained from the fraudulent conduct. Defendants maintain that doing so would amount to a penalty. *SEC v. House Asset Mgmt., Inc.*, No. 02-2147, 2004 WL 2125773, *2 (C.D. Ill. Aug. 20, 2004); *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993). Further, Flowers argues that the Court should consider the lavish lifestyle and expenditures of Nevett and his wife totaling $2,352,060 to that of Flowers totaling $1,158,941 in deciding a fair and equitable disgorgement amount.

The District Court in *SEC v. Whittemore* faced a similar issue and turned to the Third Circuit for guidance:

> [T]he Third Circuit explained, "[v]ery often defendants move funds through various accounts to avoid detection, use several nominees to hold securities or improperly deprived [sic] profits, or intentionally fail to keep accurate records and refuse to cooperate with investigators in identifying illegal profits…. Although there was evidence [defendant] transferred some of the proceeds for [co-defendant]'s benefit, (citation omitted), [defendant] never established where the ill-gotten gains finally came to rest. Unlike in *Hateley*, where "the very agreement that [was] the source of their liability" obligated the defendant to pay the other defendants 90% of the ill-gotten gains, 8 F.3d at 655, no such arrangement was shown …, and he failed to establish any alternative evidentiary basis for apportionment.

659 F.3d 1, 12 (D.C. Cir. 2011). Defendants do not provide evidence of an express arrangement indicating the percentage each defendant was to receive. Instead, they point to the expert opinion relying on the shared American Express credit card statements as evidence of each Defendant's pecuniary gain and as an alternative basis for apportionment between Fruition and Flowers on the one hand, and Nevett on the other. Plaintiff is seeking

7

disgorgement of an amount almost identical to the total payments made by Defendants for credit card purchases, differing only by $340.00. Plaintiff contends that since Flowers and Nevett avoided depositing their ill-gotten gains into their personal bank accounts, there is no direct evidence of their respective pecuniary gain. The SEC's expert was not able to identify the amounts that Flowers and Nevett each "personally received," but only the amounts paid to the credit card account, held in the name of Checkpoint Marketing and paid from bank accounts belonging to Fruition and Kavame Holdings.

Defendants must show with "concrete evidence—that the ill-gotten gains [each] benefited from may clearly and easily be segregated from [the] overall profits." *Sec. & Exch. Comm'n v. E-Smart Techs., Inc*., 139 F. Supp. 3d 170, 188 (D.D.C. 2015). Although payments made to the Checkpoint Amex card are a modest indication of Flowers' and Nevett's individual pecuniary gain - likely, although not definitively from the fraudulent scheme – the credit card payments do not provide conclusive evidence of the percentage of profit each personally received. The Amex statement does not allow the Court to determine what percentage of the ill-gotten gains ultimately remained with Fruition or what portion of the credit card payments originated from alternate sources of income. Defendant Nevett argues in opposition to Plaintiff's motion that a "rather large leap of faith" is required to link the disgorgement amounts from the sale of securities to luxury purchases made on a credit card. See *Doc. No*. 35, p. 8. While the opinion of Plaintiff's expert as to Flowers and Nevett's personal benefit may be reasonable in light of the information available, Defendants offered no concrete evidence that the ill-gotten gains could be easily traced through various accounts, transactions, and transfers into the final form of a credit card payment. Defendants have not met their burden of establishing an alternative evidentiary basis for apportionment and therefore the Court finds joint and several liability is appropriate.

### 3. Calculation of Pre-Tax Proceeds

Plaintiff's forensic expert opined that the total gross proceeds from the securities transactions amounted to $4,035,389. After deducting acquisition and transaction costs, the

pre-tax proceeds amounted to $3,684,954. Flowers and Fruition contend an analytical error was made in calculating the pre-tax proceeds because the expert failed to fully credit acquisition and commission costs – namely the initial payment for Lincot and Artec shares of $607,250, transactional attorneys' fees of $37,000, and a 1.5% commission for sales of stock made through the brokerage firm totaling $37,934. Defendants argue these costs should be factored into the pre-tax proceed calculations.

Plaintiff requests the Court preclude Defendants from now presenting evidence since they invoked their Fifth Amendment right against self-incrimination and refused to answer questions about the fraudulent scheme, how it operated, what their expenses and profits were, or their financial condition. Consideration of Defendants' evidence now, Plaintiff argues, would be unfairly prejudicial since it was withheld during discovery. The Court agrees and finds that Defendants forfeited the right to offer evidence disputing the accuracy of Plaintiff's calculations. *See SEC v. Colello*, 139 F.3d 674, 677-78 (9th Cir. 1998); see also *SEC v. Rose Fund, LLC*, 156 Fed. Appx. 3 (9th Cir. 2005). The Court declines Defendants' request to deduct additional costs and fees not accounted for by Plaintiff's expert when calculating pre-tax proceeds. The disgorgement amount of $3,684,954.00 represents "a reasonable approximation of the profits causally connected to the violation." *Rose Fund LLC*, 156 F. Appx. at 4 (quoting *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1192 n. 6 (9th Cir.1998)).

### B. CIVIL PENALTIES

The Securities and Exchange Acts provide for three tiers of penalties and the amount of any penalty is to be "determined by the court in light of the facts and circumstances." 15 U.S.C. §78u(d)(3)(B), 15 U.S.C. § 77t(d)(2)(A). First tier penalties may be imposed for any violation of either Act. See id. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). Second tier penalties apply to violations that "involved fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement." *Id*. §§77t(d)(2)(B), 78u(d)(3)(B)(ii). Third-tier penalties apply to violations that (i) involve "fraud, deceit, manipulation, or reckless disregard of a regulatory requirement" and (ii) "directly or indirectly resulted in substantial

losses or created a significant risk of substantial losses to other persons." *Id*. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). A penalty cannot exceed the greater of either a specific statutory amount, or "the gross amount of pecuniary gain to such defendant as the result of the violation." *Id*. §§ 77t(d)(2), 78u(d)(3)(B).

The specific amount of the civil penalty imposed within each tier is discretionary. In assessing an appropriate civil penalty, courts often apply the *Murphy* factors. *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980). Those factors include: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (5) the sincerity of his assurances against future violations. *See Murphy*, 626 F.2d at 655; see also *CMKM Diamonds, Inc*., 635 F. Supp. 2d at 1192.

The SEC requests that the Court impose third-tier civil penalties equal to the gross pecuniary gain that each Defendant realized. Plaintiff argues that Flowers and Nevett: (1) acted with a high level of scienter, as shown by their efforts to conceal their actions through the use of nominee companies and accounts; (2) organized and participated in recurrent violations, first with Lincot, then with Artec; (3) have not admitted the allegations or recognized the wrongful nature of their conduct and; (4) have not provided any assurances against future violations. Plaintiff further argues that since both Flowers and Nevett have a history of federal securities law violations, substantial civil penalties are necessary and appropriate for both punishment and deterrence. [6]

Defendants argue that they (1) have voluntarily left, and consented to a judgment barring them from, the penny stock industry, (2) do not currently have gainful employment, and (3) have been permanently enjoined from future violations pursuant to the entry of

---

[6] Flowers requests the Court take judicial notice of the order granting relief from judgment in the prior state court action referenced by Plaintiff. Pursuant to Fed. R. Evid. 201(c)(2), the Court must take judicial notice if a party requests it and the court is supplied with the necessary information.

10

judgment. Further, Defendants contend that the invocation of their Fifth Amendment rights should not be held against them in determining the civil penalty. In addition, and in spite of Fruition's agreement to pay disgorgement and civil penalties, Defendants argue that Fruition should be excused from monetary remedies and civil penalty. Flowers concedes that Fruition is merely an alter ego and that he will ultimately be responsible for any pecuniary gain realized by Fruition, as well as any financial penalty imposed. At most, Defendants request the statutory maximum[7] be imposed as opposed to penalties equal to each Defendants' gross pecuniary gain.

Weighing the *Murphy* factors, the Court finds a high level of scienter involved in both schemes. The Court takes into consideration Defendants' willful and early departure from the penny stock industry and their consents to entry of judgment providing assurances against future violations. The Court declines to penalize Defendants for asserting their constitutional right under the Fifth Amendment and assigns no weight to Defendants' failure to admit the allegations.

Separate and apart from the *Murphy* factors, Defendants implore the Court to consider each Defendant's respective ability to pay the penalty imposed. The Court notes Nevett and his wife are currently joint-debtors in a Chapter 7 bankruptcy proceeding and neither he nor his wife are employed. Flowers submits that Fruition is non-operational and has no assets. However, financial status plays a nominal role in this Court's' assessment. The serious and sophisticated nature of the offense, the financial harm caused to victims, intentional misconduct alleged and willful participation by Defendants in the recurrent fraud on the public are all factors that significantly tip the scales of justice. Accordingly, the Court assesses civil penalties for each scheme involving Lincot and Artec separately as follows:

---

[7] For third-tier penalties involving violations that occurred after 2009 through March 5, 2013, the statutory amount, adjusted for inflation, is $150,000 for natural persons. After March 6, 2013 through November 2, 2015, the statutory amount is $160,000 for natural persons. *See* 15 U.S.C §78u(d)(3). For a corporate entity, the amounts are $725,000 and $775,000, respectively. *Id*.

Defendant Troy Flowers to pay a civil penalty of $150,000 for violations relating to Lincot and $160,000 for violations relating to Artec.

Defendant Sean Nevett to pay a civil penalty of $150,000 for violations relating to Lincot and $160,000 for violations relating to Artec.

Defendant Fruition Inc. to pay a civil penalty of $725,000 for violations relating to Lincot and $775,000 for violations relating to Artec.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Monetary Remedies is GRANTED in part and DENIED in part.

**IT IS HEREBY ORDERED** that:

(1) Defendant Troy Flowers' request for judicial notice is GRANTED;

(2) Plaintiff's motion to strike Exhibit H to Defendant Troy Flowers' declaration and the declaration of Kelly Flowers in support of Defendants' opposition is DENIED;

(3) Defendants Troy Flowers, Sean P. Nevett, and Fruition Inc. are held joint and severally liable and shall pay disgorgement of the ill-gotten gains in the amount of $3,684,954.00 and prejudgment interest in the amount of $194,443.31, for a total of $3,879,397.31;

(4) Plaintiff's request for third-tier civil penalties is GRANTED in part and DENIED in part as follows:

    a. Defendant Troy Flowers shall pay civil penalties of $310,000;

    b. Defendant Sean P. Nevett shall pay civil penalties of $310,000; and

    c. Defendant Fruition Inc. shall pay civil penalties of $1,500,000.00.

**IT IS SO ORDERED**.

DATED: November 16, 2018

                              HON. JOHN A. HOUSTON
                              UNITED STATES DISTRICT JUDGE